Matter of Jada W. (Fanatay W.) (2023 NY Slip Op 04318)

Matter of Jada W. (Fanatay W.)

2023 NY Slip Op 04318

Decided on August 16, 2023

Appellate Division, Second Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on August 16, 2023
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

COLLEEN D. DUFFY, J.P.
LINDA CHRISTOPHER
DEBORAH A. DOWLING
LILLIAN WAN, JJ.

2022-03131
 (Docket No. N-31118-17)

[*1]In the Matter of Jada W. (Anonymous). Administration for Children's Services, appellant; Fanatay W. (Anonymous), etc., respondent.

Sylvia O. Hinds-Radix, Corporation Counsel, New York, NY (Rebecca L. Visgaitis and Amy McCamphill of counsel), for appellant.
Brooklyn Defender Services, Brooklyn, NY (Kathryn V. Lissy of counsel), for respondent.
Richard L. Herzfeld, New York, NY, attorney for the child.

DECISION & ORDER
In a proceeding pursuant to Family Court Act article 10, the petitioner appeals from an order of fact-finding of the Family Court, Kings County (Melody Glover, J.), dated April 27, 2022. The order of fact-finding, after a hearing, dismissed the petition. Justice Dowling has been substituted for Justice Zayas (see 22 NYCRR 1250.1[b]).
ORDERED that the order of fact-finding is reversed, on the law and the facts, without costs or disbursements, the petition is reinstated, a finding is made that the mother neglected the subject child, the matter is remitted to the Family Court, Kings County, for a dispositional hearing and a determination thereafter, and a temporary order of protection dated March 10, 2022, is continued pending that hearing.
In November 2017, the Administration for Children's Services (hereinafter ACS) filed a petition against the mother alleging, inter alia, that she had neglected her then 7-year-old daughter (hereinafter the child) by failing to provide the child with proper supervision or guardianship in that she knew or should have known that her then 15-year-old son (hereinafter the son) with whom she left the child was sexually abusing the child.
ACS's theory of neglect, and the position which it propounded during the hearing, as set forth in the allegations in the petition—and as delineated by counsel for ACS on the second day of the hearing as well as at the conclusion of the hearing, which transpired over the course of more than a year—was that the mother neglected the child by leaving the child unattended in the supervision of the son even though the mother knew that the child had alleged that the son had sexually abused her. ACS argued that the mother neglected the child by allowing the son to be a caretaker of the child despite the concerns the mother had or should have had about the son's history of sexual inappropriateness [FN1]. Contrary to the position articulated by our dissenting colleague, the petition expressly set forth this theory of neglect:
[The child is] under eighteen years of age whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of [her] mother . . . to exercise a minimum degree of care in that:
1. The respondent mother . . . fails to provide the subject [child] with proper supervision or guardianship in that she knew or should have known that the [son] was sexually abusing the subject child, and/or by any other acts of a similarly serious nature requiring the aid of the court, in that:
. . .
g. The respondent mother admitted that she leaves the subject child . . . alone with [the son] to hang out with her friends and work. The respondent admitted that she leaves the subject child . . . in the care of [the son] at least twice a week.
Based on the foregoing, the subject [child is] neglected or at risk of becoming neglected pursuant to Article Ten of the Family Court Act (emphasis added).
The petition also alleged, among other things, that the child informed school personnel at Brooklyn Community Services that the son masturbated in front of her on a regular basis and that he made her have sex with him, beginning when she was five years old. Specifically, the petition alleged, inter alia, that the child had told school personnel that the son made her take her underwear off, that he took off his underwear and had sex with her, and that the child depicted to school personnel a pumping motion with her hand to demonstrate what the son did with his penis when they were both naked from the waist down. The petition also alleged that the child told school personnel that the son "put his finger up her butt," that it occurred when the mother left them alone while she was at work, and that this "began when she was five (5) years old."
The hearing was commenced in March 2020; after ACS introduced certain records into evidence and an ACS caseworker (hereinafter the first caseworker) testified, the matter was adjourned to a new date. On the next hearing date, in May 2021, another ACS caseworker (hereinafter the second caseworker) testified that, after receiving a report, ACS arrived at the mother's home at approximately 3:00 a.m. on a date in November 2017 and the then seven-year-old child answered the door. The second caseworker testified that the child said that her mother was not at home but that her brother—who was then 15 years old—was home. The child was directed to get the son, who thereafter arrived at the door.
Approximately a half hour later, the mother, smelling of alcohol, arrived at the home. The second caseworker then spoke with the child and asked her if she knew her body parts and the child was able to identify them. The second caseworker then asked the child if anybody ever touched her private parts and the child said, "her, and her brother had sex." The second caseworker testified that she asked the child when was the last time and the child responded, "yesterday." The second caseworker then asked the child whether she knew what sex was, and the child responded, "you know what sex is, she shook her head, she said, you know what sex is." The child told the second caseworker that "her mother told her to say that it was a lie, to tell us what she told the school was a lie." The second caseworker further testified that the child told her that "her mother had checked her down [there] and she pointed to her private area—and that everything was okay." The second caseworker testified that the mother's screaming reaction to the police, who had arrived in response to a call from the first caseworker, when the mother arrived at the house prevented her from continuing her conversation with the child.
The first caseworker, who testified on the first day of the hearing in March 2020, averred that she spoke with the son, who admitted that he watches pornography, said that he has his own account, and said that the child did observe him watching pornography.
The first caseworker testified that she later had a conversation with the mother about whether there were any concerns about the son acting out sexually, and the mother replied that it was a lie. The first caseworker testified that the mother then told her that the child's godmother had told the mother that the child told the godmother that the son had touched the child's private part underneath her panties. The mother said that she didn't want to believe one child over the other. The first caseworker testified that she had observed an interview of the child conducted by an employee of the Brooklyn Child Advocacy Center, and that during that interview the child told the interviewer that the son was watching something that the child called "polo," which the child described as "a man and a woman they don't have any clothes on and they put their private parts into each other and that the boy moves around and he carries the woman somewhere." The first caseworker testified that the interviewer then asked the child if anything had happened between her and the son, and the child said she did not want to talk about it further; she had talked about it already.
At the May 2021 hearing date, the second caseworker testified that she, too, asked the mother if there had been "any previous concerns with [the son] acting out sexually," and that the mother admitted to her that when the son was 10 years old, the mother's brother found the son with the mother's then 8-year-old nephew in a room where the son was "pulling—bending the nephew down—bending the nephew over and pulling down his under wears [sic]." The second caseworker testified that she asked the mother if the child had reported anything like that before and the mother responded that the child told her godmother that "[the son] had pulled her panties down." The [*2]second caseworker testified that the mother said this occurred when "[the child] was four and [the son] was 12 at the time." The mother told the second caseworker that she had taken the child to the hospital." The mother told the second caseworker that she had also taken the son to a psychologist a couple of times but stopped when the son no longer wanted to go. The mother told the second caseworker that the son "had apologized" about the incident with his cousin and said that he was "sorry for humping his cousin."
Also in evidence at the hearing were medical records regarding an examination of the child at Kings County Hospital Center where she was taken after the report of the incident to ACS. The medical records show that the child was evasive when questioned about the sexual abuse, and stated that "if she [said] anything, she [would] be 'taken away.'" The records indicate that the doctor noted that the child "seem[ed] to be playful and talkative," but became "very quiet when asked about any sexual encounter between her and [the son]."[FN2] Likewise, according to the testimony of the second caseworker, initially the child was talkative and answering questions until she heard her mother scream at police officers in another room, at which point the child stopped responding to the caseworker's questions.
The mother also testified at the hearing, and admitted that the morning that ACS came to her apartment in November 2017 was not the first time that someone had brought concerns to her attention about her son's sexually inappropriate behavior. The mother testified to the conversation she had with her brother wherein her brother "came to [her]," told her "your son is bending my son over," and told her to "handle [it]." The mother testified that she then spoke with her son and the cousin together and they told her that nothing had happened. Her son told her that they were "reacting to what they saw on Adult Swim," which she testified was an after hours cartoon network for adults that has "nudity, cartoons and stuff like that." The mother also testified that the son said that he was "bending his friend over and his friend was bending him over and they was pumping each other." When asked what she understood the son to mean by "pumping each other," the mother demonstrated by making a thrusting motion. The mother also acknowledged her statements to the first caseworker that there was another incident in which the child's godmother reported to the mother that the child told the godmother that the son had touched her. The mother testified that she confronted the son about the godmother's statement and the son told her that it did not happen. The mother testified that she also asked the child about the incident and that the child told her that the son did not touch her private part but only pulled her panties down to help her in the bathroom. The mother also testified that she asked the child if she knew what her private part was and that the child pointed to her chest. The mother testified that the child was not upset or crying but that she took her to the hospital to get checked out. According to the mother, after the doctor examined the child, she was given a prescription for a cream for eczema and cold medicine. The mother offered no [*3]documentation or medical records to support this contention.
The mother also admitted to the incident where the child told her that the son was watching "two naked people on the screen getting on top of each other" while the child was on the couch. However, the mother contended that she then took the son to a psychologist and that he attended every week once per week for three months. In contrast, the second caseworker testified that, with respect to services for the son, the mother told her she took the son to a psychologist a couple of times and then stopped because the son didn't want to go.
The mother also testified that, based on the discussions with the psychologist and a review of her cable bill, she determined that her son was watching pornography and testified that she took his devices from him and had a talk with him. Although the mother contended that she took the son's devices from him, the first caseworker testified that the son told her that he has his own account and that he watches pornography and that the child had observed him doing so.
After the fact-finding hearing, the Family Court determined that the testimony of each of the two caseworkers was credible and, without specification, that the mother was "mostly credible." However, the court determined, in effect, that ACS was required to prove that the son was sexually abusing the child as a prerequisite to establishing that the mother neglected the child, and that the child's out-of-court statements to school personnel, the child's statements to the caseworker that the son has had sex with her, and the statements the child made to her godmother were uncorroborated, and thus dismissed the petition. ACS appeals. We reverse.
In a child protective proceeding pursuant to Family Court Act article 10, the petitioner has the burden of proving neglect by a preponderance of the evidence (see Family Ct Act § 1046[b][i]).
Here, the Family Court erred in determining, in effect, that proving sexual abuse was a prerequisite to proving neglect and that ACS had not proven that the mother neglected the child (see Matter of Alexis C., 27 AD3d 646, 647-648; Matter of Jasmine B. [Felisha B.], 4 AD3d 353, 353). A finding of neglect is warranted when a parent allows the child to be harmed or placed in substantial risk of harm (see Family Ct Act § 1012[f][i]). A parent, who, by willful omission, fails to protect a child, and as a consequence places the child at imminent risk of harm, demonstrates a fundamental defect in understanding the duties and obligations of parenthood and creates an atmosphere detrimental to the physical, mental, and emotion well-being of the child (see Matter of Krystin M., 294 AD2d 577, 577; see also Matter of Alexis C., 27 AD3d at 647). Here, ACS contended that the mother neglected the child because, despite her knowledge of the son's sexually inappropriate behavior, the mother failed to provide proper care and supervision for the child by leaving the child alone with the son.
The Family Court also erred in finding that the child's out-of-court statements about sexual abuse were uncorroborated [FN3]. To establish its burden of showing by a preponderance of the [*4]evidence that the mother neglected the child, a petitioner may rely upon prior out-of-court statements of the child, provided that they are properly corroborated (see Matter of Alven V. [Ketly M.], 194 AD3d 725, 726). As noted by the Court of Appeals in Matter of Christina F. (Matter of Christina F., 74 NY2d 532, 535), "[s]ince [the] enactment of the Family Court Act, courts have struggled with the issue of corroboration," and it is especially troubling in cases of sexual abuse of children in family settings. "Such abuse typically occurs in secret with the child-victim as the only witness; the child may be reluctant or unable to testify; and erroneous dismissal of the petition can have disastrous consequences" (id. at 535). "In an effort to alleviate these problems, the Legislature, in 1969, enacted the Child Protective Procedures Act (Family Ct Act art 10)" (Matter of Nicole V., 71 NY2d 112, 117). The proceedings are civil in nature and a finding of abuse or neglect need only be supported by a preponderance of the evidence (see id.). The Legislature has made "clear that the corroboration requirements of the criminal law are not applicable in article 10 proceedings" (Matter of Christina F., 74 NY2d at 536). "Corroboration, for purposes of article 10 proceedings, is defined to mean '[a]ny other evidence tending to support the reliability of the previous statements, including, but not limited to the types of evidence defined in this subdivision'" (Matter of Christina F., 74 NY2d at 536, quoting Family Ct Act § 1046[a][vi] [emphasis added]; see Matter of Alven V. [Ketly M.], 194 AD3d at 726).
In Matter of Nicole V. (71 NY2d at 119), the Court of Appeals found sufficient the testimony of the child's caseworker, the child's therapist, and the child's mother—each of whom testified to out-of-court hearsay statements by the child describing incidents of sexual abuse by the respondent in that action. There, the Court found that other evidence in the proceeding—including testimony from an expert that the child's behavior was symptomatic of a sexually abused child—was sufficient to corroborate the child's out-of-court statements. The Court noted that the expert identified classic symptoms of child abuse such as a withdrawn demeanor—a typical avoidance mechanism adopted by persons suffering from posttraumatic stress—and the child's knowledge of sexual activity far beyond the norm for her young age (see Matter of Nicole V., 71 NY2d at 121), and that the child's statements demonstrated specific knowledge of sexual activity (see id. at 122). The Court also found that the testimony of the mother that the child had developed a vaginal rash after a visit with the respondent corroborated the child's statements (see id.). Notably, the evidence here, like the evidence in Matter of Nicole V., shows that the child had specific knowledge of sexual activity despite her young age and, when asked at the hospital about the sexual abuse, her demeanor changed and she became quiet.
Also notable in Matter of Nicole V. is the discussion by the Court of Appeals about cross-corroboration. The Court noted that, although the out-of-court statements of a child relating to allegations of abuse or neglect must be corroborated to make a finding of abuse or neglect, in certain circumstances, particularly in child abuse proceedings, where the interests of the child are paramount, independent statements requiring corroboration may corroborate each other (see Matter of Nicole V., 71 NY2d at 124, citing with approval Matter of Cindy JJ., 105 AD2d 189 [admission of respondent father that he had sexual intercourse with his oldest daughter corroborates out-of-court statements by the three younger children of his sexual abuse against them despite respondent's denial of such sexual contact with those children]).
This Court has found that evidence of a change in the demeanor of a child, sexual references by a child which are not age appropriate, and detailed, consistent out-of-court statements of sexual abuse can be sufficient to corroborate a child's out-of-court statements of sexual abuse (see Matter of Osher W. [Moshe W.], 198 AD3d 904, 907). For example, in Matter of Osher W. (Moshe W.) (198 AD3d 904), this Court determined that, "'[a]lthough the mere repetition of an accusation does not, by itself, provide sufficient corroboration, some degree of corroboration can be found in the consistency of the out-of-court repetitions'" (id. at 907, quoting Matter of Lily BB. [Stephen BB.], 191 AD3d 1126, 1127). Here, the child's statements to school personnel, her godmother, and the caseworkers were consistent and detailed about the sexual activity that the son had engaged in with her. In addition, both the mother's acknowledgment at the hearing that the son admitted to her that he watched pornography in the child's presence and the son's admission to the first caseworker that he had his own pornography account directly corroborated the child's statements that the son watched pornography in her presence. The child's knowledge of sexual behavior despite her age—her depiction to school personnel of the son's pumping motion with his penis and her discussion of sex, which she called "polo" to the first caseworker, describing it as where "a man and a woman they don't have any clothes on and they put their private parts into each other," was further corroboration of her out-of-court statements about the son's sexual abuse of her. Moreover, the records submitted into evidence demonstrate that the child, who had been happy and talkative at the hospital, became withdrawn and quiet when asked about the sexual abuse.[FN4]
Accordingly, under these circumstances, the Family Court should have found that the child's out-of-court statements were sufficiently corroborated by the other evidence in the record that supported the reliability of the child's out-of-court statements that the son had sexually abused her (see Matter of Michael B. [Samantha B.], 130 AD3d 619, 621; Matter of Jada A. [Robert W.], 116 AD3d 769, 770).
Finally, contrary to the mother's contentions raised for the first time on appeal, the record does not demonstrate that ACS posited a new theory of the case—to wit, that the mother neglected the child by failing to provide proper supervision—not set forth in the petition. On the second day of the hearing, counsel for ACS argued to the Family Court that the issue was "not about whether or not [the] child was sexually abused. It's about [the mother's] capacity or her judgment in allowing [the son] to continue to supervise [the child] unattended." At that time, in connection with an objection made to certain testimony elicited from the second caseworker, the court inquired of the attorney for the child (hereinafter the AFC), "[d]o you adopt the same position?" The AFC replied, "[a]bsolutely, Your Honor." The court then overruled the objection and counsel for the mother responded, "Okay." At the end of the hearing, counsel for ACS reiterated that its position [*5]was that it need not establish neglect on the basis that the child was abused, but rather that the mother left the child with the son, an inappropriate caregiver, notwithstanding concerns expressed to the mother that the son had been sexually inappropriate with the child.
Although our dissenting colleague emphasizes that the credibility findings of the Family Court are entitled to great weight, here, the Family Court determined, without qualification, that both caseworkers were credible, but indicated only that the mother was "mostly credible." The dissent ignores the caseworkers' credible testimony and relies primarily on the mother's testimony to find that the petition was properly dismissed. However, with respect to the mother's testimony, since the Family Court failed to specify what portion of the mother's testimony was "mostly credible" and what was not, we look to the record to ascertain whether there is any independent corroboration of the mother's testimony (see Matter of Tazya B. [Curtis B.], 180 AD3d 1039, 1040; Matter of Nah-Ki B. [Nakia B.], 143 AD3d 703, 706).
Our dissenting colleague finds that, to the extent that the son's behavior was sexually inappropriate, the mother's response to such behavior was appropriate. However, the mother's self-serving testimony about her purported responses to the allegations of sexual inappropriate behavior by the son has no independent corroboration in the record—and, in some instances, was flatly contradicted during the hearing by the testimony of the two caseworkers about what the mother said to them. The first caseworker averred that when she asked the mother whether there were any concerns about the son acting out sexually, the mother replied that it was a lie. It appears incredible that the mother would seek out treatment or punish the son or even speak to him about issues when she believed such concerns were a lie. Moreover, the mother's testimony that she took the son to a therapist—whose name and address the mother could not remember—regularly for a three month period stands in stark contrast to that of the first caseworker, who testified that the mother told her that she took the son to therapy a couple of times and then stopped because the son did not want to go. The mother also contended that she punished the son for watching pornography by taking away "his devices," which testimony is undermined by the son's statement to the first caseworker that he watches pornography and has his own account. The mother also contended that, in response to concerns that the son had touched the child under her panties, she took the child to the doctor who simply prescribed a cream for the child. The mother provided no support for this purported doctor's visit.
Contrary to the conclusion reached by our dissenting colleague, we find that the record demonstrates that, despite the mother's declaration to the contrary, she had or should have had concerns regarding the son's inappropriate sexual behavior and that, despite these concerns, she continued to leave the child alone with the son, thereby failing to provide proper supervision or guardianship (see generally Matter of Melody H. [Dwayne H.], 121 AD3d 686, 687; Matter of Sinclair P. [Arthur P.], 119 AD3d 587, 588).
Accordingly, we must reverse the order of fact-finding, reinstate the petition, make a finding that the mother neglected the child, remit the matter to the Family Court, Kings County, for a dispositional hearing and a determination thereafter, and continue a temporary order of protection dated March 10, 2022, pending that hearing.
DUFFY, J.P., CHRISTOPHER, and DOWLING, JJ., concur.
WAN, J., dissents, and votes to affirm the order of fact-finding dated April 27, 2022, with the [*6]following memorandum:
I respectfully disagree with the conclusion reached by my colleagues in the majority to reverse the order of fact-finding. In my view, the Family Court correctly found that the Administration for Children's Services (hereinafter ACS) failed to establish neglect by a preponderance of the evidence. Accordingly, I would affirm the order of fact-finding.
Initially, I respectfully disagree with the conclusion of my colleagues in the majority that the Family Court erred in finding that, based upon the allegations in the petition, ACS was required to prove that the mother's 15-year-old son (hereinafter the son) was sexually abusing the subject child (hereinafter the child) as a prerequisite to establishing that the mother neglected the child. In my view, the court simply found that ACS failed to prove what was alleged in the petition by a fair preponderance of the evidence.[FN5]
Here, paragraph (1) of the first addendum to the petition, dated November 15, 2017, expressly alleged that the mother "fails to provide [the child] with proper supervision or guardianship in that she knew or should have known that [the son] was sexually abusing [the child] and/or by acts of a similarly serious nature requiring the aid of the court" (emphasis added). Following this allegation, the first addendum to the petition sets forth five subparagraphs, (a) through (e), that relate to the son's alleged sexual abuse of the child. Subparagraph (f) sets forth that the mother had knowledge of two prior incidents of sexually inappropriate behavior that occurred more than three years before the November 2017 reports of abuse, and subparagraph (g) alleges that the mother admitted that she leaves the child home alone with the son at least twice a week.
The majority's characterization of ACS's theory of neglect, "that the mother neglected the child by leaving the child unattended in the supervision of the son even though the mother knew that the child had alleged that the son had sexually abused her," is not supported by the text of the petition. The majority's selective citation only to the introductory statement in paragraph 1 of the first addendum to the petition, followed by subparagraph (g), ignores that subparagraphs (a)-(g), which contain the allegations of the alleged sexual abuse and the son's allegedly sexually inappropriate behavior, refer directly to ACS's allegation that the mother knew or should have known that the son was sexually abusing the child. Notably, neither ACS nor the attorney for the child have argued, either in the Family Court or on appeal, that subparagraph (g) sets forth or supports their alleged alternate theory of neglect. Given the content and context of subparagraphs (a)-(g), the use of the phrase "and/or by acts of a similarly serious nature requiring the aid of the court," a statutory catchall provision contained in Family Court Act § 1012(f)(i)(B), is insufficient to apprise the mother of an alternate theory of neglect. Moreover, there was no direct evidence presented at the hearing that highlighted when the mother knew or should have known that the son was sexually abusing the child.
Since ACS was required to prove, by a preponderance of the evidence, the allegations in its pleadings that the mother knew or should have known that the son was sexually abusing the [*7]child, this Court must first assess whether ACS has proven, by a fair preponderance, that the son was abusing the child [FN6]. I disagree with the majority's conclusion that there was sufficient corroboration for the child's out-of-court statements that the son was sexually abusing her. It is true that the corroboration requirements of the criminal law are not applicable in Family Court Act article 10 proceedings (see Matter of Christina F., 74 NY2d 532, 536), and that pursuant to Family Court Act § 1046(a)(vi), "[a]ny other evidence tending to support the reliability of [a] child's [out-of-court] statements" relating to any allegations of abuse or neglect "shall be sufficient corroboration" (Matter of Gerald W. [Anne R.], 129 AD3d 979, 980). However, "[t]here is a threshold of reliability that the evidence must meet" (id.). "Whether or not proffered corroborative testimony actually 'tend[s] to support the reliability of the previous statements' in a particular case is a fine judgment entrusted in the first instance to the Trial Judges who hear and see the witnesses" (Matter of Christina F., 74 NY2d at 536, quoting Family Court Act § 1046[a][vi]). "In individual cases, 'Family Court Judges presented with the issue have considerable discretion to decide whether the child's out-of-court statements describing incidents of abuse or neglect have, in fact, been reliably corroborated and whether the record as a whole supports a finding of [neglect]'" (Matter of Christina F., 74 NY2d at 536, quoting Matter of Nicole V., 71 NY2d 112, 119).
Here, according to the petition, the child made two out-of-court statements alleging that the son was sexually abusing her. In the first out-of-court statement, made to school personnel on November 13, 2017, the child alleged that the son "masturbates in front of her on a regular basis," "put his finger up her butt," and that on November 12, 2017, the son "makes her take her underwear off and he takes his underwear off and has sex with her." In her second out-of-court statement alleging sexual abuse, made to Child Protective Specialist Shaturka Wilson (hereinafter CPS Wilson) on November 14, 2017, the child "stated that she [and] her brother have sex and they recently had sex yesterday."
In determining that the child's out-of-court statements were sufficiently corroborated, my colleagues in the majority rely upon Matter of Nicole V. (71 NY2d 112), and Matter of Osher W. (Moshe W.) (198 AD3d 904). However, both cases are distinguishable, since the amount and quality of the corroborative evidence in those cases was significantly greater than that presented here. In Nicole V., the evidence corroborating the child's out-of-court statements included validation testimony from the child's treating therapist, who was qualified as an expert, that the child had been sexually abused. The expert testified about the child's age-inappropriate sexual behavior, the child's regressive behavior and withdrawal, and displays of extreme anger and fearful behavior, all of which she opined were "symptomatic of an abused child" (id. at 122). Further, the child's out-of-court "statement was also corroborated by evidence that she suffered from vaginal rashes, depression and sleep disturbances, that blood was found in her vaginal area and by a certified medical report stating that she had no hymen" (id. at 122). Notably, here, there is a complete lack of any medical evidence, either physical or psychological, to corroborate the child's statements that she had been sexually abused.
Similarly, in Osher W., corroboration included the child's use of age-inappropriate knowledge of sexual activity when describing the sexual abuse to his grandmother, the consistent nature of the child's out-of-court statements, certain changes in the child's behavior that [*8]corresponded with the timing of some of the abuse, and the father's acquiescence to a finding by a rabbinical court that limited his contact with the child for approximately a decade. Again, here, there is no evidence of any acquiescence or tacit acknowledgment that the child was being sexually abused. Instead, both the mother and the son denied that the son was abusing the child.
The majority highlights the child's knowledge of sex despite her young age as corroboration of her out-of-court statements that the son was sexually abusing her. However, age-inappropriate knowledge of sexual matters, standing alone, is insufficient to corroborate a child's out-of-court statements concerning sexual abuse (see e.g. Matter of Zamir F. [Ricardo B.], 193 AD3d 932, 934-935; Matter of Carmellah Z. [Casey V.], 177 AD3d 1364, 1367; Matter of Kyle D. [Dwayne D.], 138 AD3d 835, 835-836; Matter of Brittany K., 308 AD2d 585, 586; Matter of Victoria H., 255 AD2d 442, 443; Matter of Kelly F., 175 AD2d 803, 804).
I also disagree with the majority's conclusion that the child's statements to school personnel, her godmother, and the caseworkers were consistent and detailed about the alleged abuse. Notably, no school personnel testified at the fact-finding hearing, and the caseworkers' testimony about the child's out-of-court statements concerning the alleged abuse was extremely limited. Additionally, the godmother's statement that the child had reported to her that the son had pulled down her panties and touched her private part was not admitted for the truth of the matter asserted. Moreover, this incident occurred approximately four years prior to the child's allegations of abuse. Further, the mother, who the Family Court found "mostly credible," testified that the child, who was three to four years old at the time, denied that the son touched her inappropriately, and further explained that the son had been assisting the child to use the bathroom. Moreover, the mother testified that, as a result of the godmother's statement, she took the child to Brookdale Hospital, where she was examined and where she received a prescription for cold medicine and eczema, a medical condition from which the child had suffered since birth. Based upon the admissible evidence presented at trial, the godmother's statement about an incident that occurred approximately four years prior to the child's allegations of abuse was insufficient to corroborate the child's out-of-court statements that the son was sexually abusing her (see Family Ct Act § 1046[a][vi]; Matter of Christina F., 74 NY2d at 536).
Moreover, since "repetition of an accusation by a child does not corroborate the child's prior account of it" (Matter of Nicole V., 71 NY2d at 124; see Matter of Iyonte G. [Charles J.R.], 82 AD3d 765, 767; Matter of Jaclyn L., 307 AD2d 294, 295), it is my opinion that the majority improperly relies upon the repetition of the child's statements to school personnel and CPS Wilson as corroboration for those same statements. Although this Court has held that "some degree of corroboration can be found in the consistency of the out-of-court repetitions" (Matter of Osher W. [Moshe W.], 198 AD3d at 907 [internal quotation marks omitted]), such consistency, alone, is insufficient to satisfy the corroboration requirements of Family Court Act § 1046(a)(vi) (see Matter of Osher W. [Moshe W.], 198 AD3d 907; Matter of Tazya B. [Curtis B.], 180 AD3d 1039, 1040; Matter of Kyle D. [Dwayne D.], 138 AD3d at 835-836 [child's out-of-court statements were primarily corroborated by testimony of the petitioner's expert witness, who was an expert in the field of child sexual abuse, "together with the testimony of the petitioner's caseworker and the mother," and were only "further corroborated" by their consistency and "the fact that [the child] had age-inappropriate knowledge of sexual matters"] [emphasis added]; Matter of Alaysha E. [John R.E.], 94 AD3d 988, 988 [consistent out-of-court statements corroborated by "child's sworn in-court testimony"]; Matter of Besthani M., 13 AD3d 452, 453 [child's consistent out-of-court statements "were corroborated by the child's unsworn in-camera testimony"]; Matter of Bianca M., 282 AD2d [*9]536, 536-537 [child's consistent out-of-court descriptions of abuse corroborated by child's sworn in-court testimony]).
The majority also finds corroboration for the child's out-of-court statements contained in the child's medical records, since, according to the majority, those records established that the child had been happy and talkative at the hospital before turning withdrawn and quiet when questioned about the sexual abuse. However, these records do not provide such a clear story. Although the records indicate, at one point, that the child "seems to be playful and talkative in the ED," but "seems to keep very quiet when asked about any sexual encounter between her and her brother," they also indicate that the child "denies any inappropriate contact," and that she was "under the impression that if she says anything, she will be 'taken away.'" Moreover, for a child's change in demeanor to satisfy the corroboration requirements of Family Court Act § 1046(a)(vi), courts have generally relied upon more pronounced changes in personality (see Matter of Osher W. [Moshe W.], 198 AD3d at 907; Matter of Kimberly CC. v Gerry CC., 86 AD3d 728, 730 ["several witnesses testified that the child exhibited violent outbursts, self-abusive behavior and sexual behavior such as stimulating or rubbing herself, which appeared to coincide with the time frame in which the alleged incidents of sexual abuse occurred"]; Matter of Tyson G., 144 AD2d 673, 674 [testimony from the child's mother that the child "experienced frequent nightmares and exhibited other behavioral changes immediately following the incident"]). Here, then, the child's momentary refusal to answer questions, without more, cannot serve to corroborate her out-of-court statements.
Finally, even assuming that there was sufficient corroboration of the child's out-of-court statement that the son was watching pornography, this corroboration did not serve to corroborate the child's out-of-court statements that the son was sexually abusing her (see Matter of Jeshaun R. [Ean R.], 85 AD3d 798, 799). Therefore, it is my view that the extremely limited corroborative evidence failed to satisfy the requisite "threshold of reliability" (Matter of Gerald W. [Anne R.], 129 AD3d at 980), and, thus, was insufficient to corroborate the child's out-of-court statements that the son was sexually abusing her (cf. Matter of Nicole V., 71 NY2d at 122; Matter of Osher W. [Moshe W.], 198 AD3d at 906-907).
It is also my view that the majority is finding neglect based on an independent theory of neglect, not stated in the petition, that "despite her knowledge of the son's sexually inappropriate behavior," the mother neglected the child by leaving her alone with the son [FN7]. However, this characterization of the relief sought appears to be based solely on subparagraph (f) of the first addendum to the petition, which alleges that:
"on or about November 14, 2017[,] the [mother] admitted that this is not the first time she has heard the aforementioned concerns. The [mother] stated that around 2014, her brother . . . told her that he observed the [son] with his penis out of pants and on the buttocks of [the brother's] son, . . . [who] was eight (8) years old at the time of the incident. The [mother] also admitted that the [child] disclosed to her godmother . . . that [the son] pulled her panties down."
Given the context in which these allegations appear in the petition—as subparagraphs supporting [*10]the allegation that the mother knew or should have known that the son was sexually abusing the child—these allegations of the son's "sexually inappropriate behavior" were not alleged as an independent basis upon which the Family Court could enter a finding of neglect. Therefore, these allegations did not provide notice to the mother that they could form the basis for ACS's neglect proceeding.
I respectfully disagree with the majority's conclusion that counsel for ACS annunciated this independent theory of the case on both the second day and at the conclusion of the fact-finding hearing. On the second day of the hearing, during objections from the mother's counsel to the introduction of the hearsay statements relayed by the godmother and the mother's brother, counsel for ACS acknowledged that this testimony was "not being provided for the truth of the matter," but rather "for solely what [the mother] knew about [the son]'s or any concerns about [the son]'s past behavior." Counsel for ACS also contended that "this is about what [the mother] knew or should have known about [the son]'s behavior, as well as, if-what-what if anything [the child] had previously reported about concerns. It's not about whether or not this child was sexually abused. It's about [the mother]'s capacity or her judgment in allowing [the son] to continue to supervise [the child] unattended." The Family Court overruled the mother's objections, acknowledging that the statements were not being admitted for the truth of the matter, but as relevant to what the mother "may or may not have known at the time." This was the only time counsel for ACS alluded, in any way, to a potential alternate theory of neglect during the fact-finding hearing, which took place over five days of testimony spread out over approximately two years. Notably, ACS did not reiterate its alleged alternate theory of neglect on the record until after the hearing had ended and the court had issued its oral decision finding that ACS failed to prove the allegations in the petition by a preponderance of the evidence.[FN8]
ACS argues that the mother neglected the child by repeatedly entrusting the child to the son's care, that it is not bound to the facts as alleged in the petition, and that the Family Court can always conform the petition to the proof under Family Court Act § 1051(b). Section 1051(b) provides that "[i]f the proof does not conform to the specific allegations of the petition, the court may amend the allegations to conform to the proof; provided however, that in such case the respondent shall be given reasonable time to prepare to answer the amended allegations" ([emphasis added]; see Matter of Amier H. [Shellyann C.H.], 106 AD3d 1086; Matter of Crystal S. [Elaine S.], 74 AD3d 823).
Here, ACS never sought to amend the pleadings to conform to the proof to add their alternate theory of liability that the mother left the child with an inappropriate caretaker (see Matter of Amier H. [Shellyann C.H.], 106 AD3d at 1087 [vacating finding of neglect where "Family Court [*11]failed to amend the petition or give the mother time to prepare an answer to the new allegations"]; Matter of Crystal S. [Elaine S.], 74 AD3d at 825 [same]). Moreover, the comments by counsel for ACS in response to an evidentiary objection did not put the mother on notice of this new theory of the case that is not alleged in the petition. The cases cited by ACS in support of this contention are distinguishable from the instant matter, since those cases involved situations where the parent was afforded sufficient opportunity to defend against the allegations that were not alleged in the petition (see Matter of Jada W. [Ketanya B.], 104 AD3d 861, 861; Matter of Carmen L., 37 AD3d 468, 468 [Family Court properly conformed pleadings to proof where "court properly stated that it would give the father time to prepare an answer to the amended allegations"]).
Moreover, the cases cited by the majority do not stand for the proposition that ACS was not required to prove that the son was sexually abusing the child. Rather, those cases stand for the proposition that "a parent has neglected his or her child where . . . by willful omission, [the parent] fail[s] to protect the child and as a consequence places the child in imminent danger of sexual abuse" (Matter of Krystin M., 294 AD2d 577, 577; see Matter of Sara X., 122 AD2d 795, 796). In this line of cases, the record generally contains evidence that, although the respondent was aware of an allegation of alleged abuse, he or she continued to allow the child to remain in the presence of the alleged abuser (see Matter of Patricia B., 61 AD3d 861, 862 ["the mother was aware of a prior sexual assault committed by one of her sons against one of the children," but "allow[ed] that son to live in the family home with the children"]; Matter of Selena J., 35 AD3d 610, 611 [evidence "established that after learning from an agency counselor in the fall of 2002 that Hewlit W. had touched her daughter's buttocks, the appellant refused to believe the child and continued to allow Hewlit W. access to the home"]; Matter of Alexis C., 27 AD3d 646, 648 [evidence that the 9-year-old child informed her mother that the mother's fiancé had sexually abused her the previous day, and the mother "did not believe her daughter and allowed her fiancé to continue residing in the house"]; Matter of Krystin M., 294 AD2d at 577-578 [neglect established where appellant "allow[ed] Lemuel A. to remain in the residence and have frequent unsupervised contact with the child despite her credible and ultimately proven complaints of his abuse"]). In other similar cases, there was evidence of objectively unreasonable behavior by the respondent (see Matter of Christina P., 275 AD2d 783, 784 [evidence that "appellant mother provided inappropriate sleeping arrangements for her six-year-old daughter and the mother's paramour . . . whereby the daughter and the paramour slept together in a bedroom and in the same bed while the mother slept on a couch in the living room"]). This is the exact type of evidence that is utterly lacking in this matter.
Even assuming that the child's out-of-court statements were sufficiently corroborated to establish that the son sexually abused her in 2017, the three prior incidents testified to at the hearing were not sufficient to give the mother knowledge that the son would sexually abuse the child three to five years later, or that she could be placing the child in danger by leaving the son alone with her. As discussed above, not only was this theory of the case not alleged in the petition, but, even assuming that it was, none of the three incidents testified to at the hearing established that the mother knew or should have known that the son was sexually abusing the child, or that the mother failed to exercise the minimum degree of care required (see Family Ct Act § 1012[f][i]).
First, at the hearing, CPS Wilson testified that the mother had told her about an incident that occurred five years prior to the child's allegations of sexual abuse. CPS Wilson testified that the mother told her that, during that earlier incident, the son, who was then 10 years old, and the mother's nephew, who was then 8 years old, "were in a room, and that her uncle had caught [the son] pulling—bending the nephew down—bending the nephew over and pulling down his under [*12]wears." The mother testified that the day after she heard about the incident, she spoke to the boys, and the son indicated that the boys were "reacting to what they saw on Adult Swim," an "afterhours cartoon network for adults" with "nudity, cartoons, and stuff like that. Adult cartoons." According to the mother, the son said that the boys had watched "eyes robot or chicken robots," and as a result they were bending each other over and "pumping each other" while wearing their clothes. The mother testified that the boys "actually demonstrated for me," with the boys taking turns bending each other over and "pumping" each other. The mother testified that she "stopped it and . . . explained why that wasn't cool at all," and "[w]hy they shouldn't be doing that and why they shouldn't react [to] what they see on Adult Swim."
There is no evidence that this incident would have indicated to a reasonable parent that the child was in imminent danger of being sexually assaulted by the son.[FN9]
The second incident, discussed above, which concerned the allegation that the son pulled the child's panties down as relayed by the godmother to the mother, occurred approximately four years prior to the child's allegations of sexual abuse. In my view, the mother's response to these statements, which included directly addressing the issue with both children and taking the child to the hospital for an exam, was reasonable, and would not have indicated to a reasonable parent that the child was in imminent danger of sexual abuse by the son.
The third incident, which was not alleged in the petition, occurred in 2014—at least three years prior to the child's allegations—and concerned the child's statement to the mother that the son was watching pornography in her presence. Here, the mother testified that, according to the son, he was watching a pornographic video on the television when the child was asleep on the couch. The mother further testified that the child told her that "she just woke up and she saw them on the screen," and that the child told the son that she was going to tell the mother, and the son turned it off. Again, the mother's response to this incident was reasonable and proportionate to the offending behavior. She confronted the son about what happened and took away his devices, including the cable box, the television, and the son's video game. The mother testified that she also brought the son to a psychologist, who the son saw once a week for three months, since she didn't "know what's going on with him as a boy," and "made sure [she] had a talk with him, asked him what's going on." More importantly, however, this incident, while inappropriate, would not indicate to a reasonable [*13]parent that the child was in imminent danger of being sexually abused by the son [FN10]. It is noteworthy, then, that the mother waited at least two years from this incident before asking the son to walk the child to school, since, according to the mother, the son had "show[n] growth" and "responsibility" over that time.
It bears emphasizing that "[t]he credibility findings of the Family Court should be accorded great deference, as it had direct access to the parties and was in the best position to evaluate their testimony, character, and sincerity" (Matter of Destiny B. [Anthony R.], 203 AD3d 1042, 1042 [internal quotation marks omitted]). Here, given that ACS offered credible but limited testimony from two caseworkers, that the Family Court found the mother, who testified over the course of three days, "mostly credible," and where there is no occasion to disturb the court's credibility determination, it is my view that the record contains no evidence that the mother knew or should have known that she could be placing the child in danger by leaving her alone with the son.
Accordingly, in my view, the Family Court correctly determined that ACS failed to prove, by a preponderance of the evidence, that the son was sexually abusing the child, and the record is devoid of any corroboration of the child's out-of-court statements alleging abuse. Moreover, the three prior incidents concerning the son failed to establish that the mother knew or should have known about the alleged abuse, and did not give the mother notice that she was leaving the child with an inappropriate caretaker. Accordingly, I would affirm the order of fact-finding.
ENTER:
Darrell M. Joseph
Acting Clerk of the Court

Footnotes

Footnote 1: Despite pointing with emphasis to the section of the hearing transcript wherein ACS articulated, on the second day of the hearing, that its theory of neglect was based upon, inter alia, the mother's actions in leaving the child with an inappropriate caregiver, our dissenting colleague disputes that the mother was on notice that ACS was, in fact, seeking to establish neglect on that basis. Not only is the allegation in the petition filed with the Family Court, the mother never objected on the ground now relied upon by our dissenting colleague when ACS articulated its position on this issue—either on that second day of the hearing or at the end of the proceeding when ACS again argued this theory of neglect. Our dissenting colleague fails to address why this unpreserved issue should be reached for the first time on appeal.

Footnote 2: Without support in the record, our dissenting colleague mischaracterizes the medical records in evidence as "the child's momentary refusal to answer questions," contending that "without more" they do not corroborate the child's out-of-court statements. In fact, the medical records report that the child was evasive when questioned about the sexual abuse and that she stated that "if she [said] anything, she [would] be taken away." There is nothing to indicate that the behavior was momentary. Indeed, the child behaved in a similar way when questioned by the second caseworker, who testified that initially the child was talkative and answering questions until she heard her mother scream at police officers in another room, at which point, the child stopped responding to the caseworker's questions.

Footnote 3: Contrary to our dissenting colleague's contention as to a lack of medical evidence, medical records regarding an examination of the child were admitted as evidence, and those records indicate that, at the hospital, the child was playful and talkative until questioned about the sexual abuse, and then became evasive and stated that "if she [said] anything, she [would] be 'taken away.'" Together with other evidence in the record, these records support the reliability of the child's out-of-court statements of sexual abuse by the son.

Footnote 4: Our dissenting colleague discounts the evidence that corroborates the child's out-of-court statements—the child's change in demeanor at the hospital when asked about the sexual abuse; the mother's acknowledgment that in the past the son was caught humping his younger cousin and that he admitted to her that he engaged in that behavior; the mother's admission that the son watched pornography in the presence of the child; the child's knowledge, despite her young age, of sex; and the consistency of the child's out-of-court statements to others about the son's sexual behaviors—by parsing each piece with the repeated comment that such evidence, "standing alone," is insufficient to corroborate a child's out-of-court statements. However, as noted above, the evidence is not "standing alone," indeed, it is the totality of the corroborating evidence that establishes the reliability of the child's out-of-court statements.

Footnote 5: Specifically, the Family Court found that ACS "must prove by a preponderance of the evidence that [the mother] failed to provide [the child] with a minimum degree of care by failing to provide her with proper supervision or guardianship in that she knew or should have known that [the son] was sexually abusing [the child]."

Footnote 6: Notably, the petition originally alleged that the mother had neglected both the child and the son. However, the petition was withdrawn as to the son when he turned 18 years old.

Footnote 7: In its brief, ACS acknowledges that "[the son]'s admitted prior incidents of sexual misconduct may not have risen to the level of sexual abuse."

Footnote 8: The majority suggests that since the mother never objected to ACS's alleged articulation of its alternate theory of neglect on the second day of the hearing and at the end of the proceeding, the issue of whether ACS properly asserted its alleged alternate theory is unpreserved and improperly addressed for the first time on appeal. However, since ACS's alleged articulation of its alternate theory was insufficient to apprise the mother of any alleged alternate theory of neglect, the mother was not required to object to ACS's statement, which itself was made in opposition to the mother's objection to the introduction of certain hearsay testimony. Moreover, it is unclear why the mother would have had to object to the statement by counsel for ACS as to the alleged alternate theory of the case made after the Family Court had decided the case in the mother's favor.

Footnote 9: The majority indicates that the mother told Child Protective Specialist Marie Henry (hereinafter CPS Henry) that it was a lie that there were any concerns about the son acting out sexually. However, CPS Henry's complete testimony on this point provides necessary context:
"I did ask [the mother] if she knew of [the son] doing anything having any inappropriate sexual contact with anyone else. [The mother] said that that was a lie. She said that her brother made things up and that at the time [the son] was acting out something that he saw inappropriately on a TV show."
Given the context, CPS Henry's full testimony on this issue was consistent with the testimony of both CPS Wilson and the mother, and does not undermine the mother's testimony concerning her appropriate responses to the three incidents.

Footnote 10: In my view, contrary to the majority's contention, CPS Henry's testimony that the son continued to watch pornography does not undermine the mother's testimony about her response to this incident, since the inappropriate behavior specifically at issue here was not necessarily that the son had watched pornography, but that he had done so in the presence of the child.